Fanny PADGETT, Plaintiff

v.

Kenneth S. APFEL, as Commissioner of the Social Security Administration, Defendant

No. 98–CV–6323.

United States District Court, W.D. New York.

June 11, 1999.

Brian M. McCarthy, U.S. Attorney's Office, Rochester, NY, for plaintiff.

William J. McDonald, Jr. Bond & McDonald, Geneva, NY, for defendant.

DECISION and ORDER

SIRAGUSA, District Judge.

*INTRODUCTION*

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") that the plaintiff was not disabled, and therefore, was not entitled to widows' insurance benefits and supplemental security income ("SSI").

This Court finds that the Commissioner's decision was not supported by substantial evidence and accordingly, remands the matter for further administrative proceedings.

## PROCEDURAL BACKGROUND

On June 8, 1995, the plaintiff, Fanny Padgett ("Padgett"), applied for disabled widows' insurance benefits based on the earnings of her husband, Howard E. Padgett, who died on February 23, 1990, and on July 8, 1995, she also applied for SSI. The Social Security Administration ("SSA") denied these applications initially in September of 1995, and upon reconsideration in December of 1995. The plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), and such hearing was held on June 5, 1996. On December 23, 1996, the ALJ issued a decision in which he found that the plaintiff was not entitled either to widows' insurance benefits or SSI. The plaintiff requested a review of the ALJ's decision by the Appeals Council, which on July 20, 1998, issued a decision denying the plaintiff's request for review. The ALJ's determination thus became the Commissioner's Final Decision, and the plaintiff then commenced this action. Presently before the Court, are motions both by the plaintiff and the defendant for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

## FACTUAL BACKGROUND

### A. *Work History*

Padgett was born on August 29, 1939, and was 57 years old at the time of the ALJ's decision. (T. 36, 37). She graduated from high school in 1957. (T. 37). In 1988 and 1989, she attended Corning Community College, but was unable to complete her course of study in human services due to her husband's illness. (T. 37, 126). From 1977 through 1992, Padgett worked generally as an unskilled farm la-borer. (T. 126). More specifically, she worked as a potato warehouser, a potato harvester, and worked in a tree nursery, sorting and tying up trees. (T. 126). When working as a farm laborer in the tree nursery, she would lift up to 20 pounds four or five times a day. (T. 41). Additionally, she had to push wheel barrels loaded with dirt. (T. 42).

### B. *Medical Evidence*

Padgett has a history of petit mal seizure disorder and hypertension. From 1990 through 1996, she treated with Dr. Dennis O'Connor for these conditions. (T. 147–179).[1] Dr. O'Connor prescribed the drug Depakote to treat her seizure disorder and the drug Lopressor to treat her hypertension. (T. 166). Through 1996, Padgett's petit mal seizure disorder remained consistently under control, however, her hypertension fluctuated from being under poor control on July 20, 1993; to good control on July 20, 1993 and November 1, 1993; to poor control on May 9, 1994; to fair control on May 31, 1994; to better control on May 12, 1995; to fairly well controlled on December 22, 1995; and then to poor control on February 29, 1996. (T. 148, 151, 154, 160, 161, and 163). In February of 1996, Dr. O'Connor referred Padgett to a neurologist, Dr. David Halpert, for further evaluation with respect to her seizure disorder. (T. 147). In a report dated February 20, 1996, Dr. Halpert noted that Padgett had some numbness in the corner of her mouth and in her left hand, and some mild confusion. (T. 182). Dr. Halpert further observed that Padgett had a normal MRI scan and noted that the drug Depakote, which Padgett had been taking to control her seizure disorder, should be maintained at a therapeutic level, that is, it should be taken two or three times a day. (T. 182, 183).

Throughout the course of his treatment of Padgett, Dr. O'Connor had made various observations concerning her ability to

---

1. Padgett also treated with Dr. Syed Ehtisham for a fractured ankle. She saw him twice, once in January of 1995 and once in February of 1995. (T. 139).

work. On June 16, 1995, he offered the opinion that she could work full-time, but had some limitations due to persistent ankle pain after her fracture and because of her seizure disorder. (T. 154). On December 22, 1995, he observed that she was somewhat disabled by her complaints, and that he felt that she could do some light sedentary work such as answering the phones or working as a receptionist. (T. 151). In a "Medical Evaluation for a Social Security Disability Application," dated March 11, 1996, Dr. O'Connor concluded that Padgett was able to sit for six hours out of an eight-hour work day, that she was not required to alternate between sitting and standing, that her disability began on March 13, 1996[2] and that she is not totally disabled, but rather somewhat disabled and able to work under attached limitations. (T. 190–193). In his attached "Evaluation of Residual Functional Capacity," Dr. O'Connor indicated that Padgett does not suffer from a condition which could be expected to produce pain and that she is able to climb, balance, stoop, crouch, kneel, crawl, bend, climb stairs, reach, push, and pull, occasionally, i.e., two to three hours a day. He further indicated that she was capable of continuous standing for two hours per day, that total standing during an eight-hour day that she could accomplish would be four hours, that she was capable of continuous walking of eight hours, and continuous sitting of eight hours. Moreover, he indicated that she could lift and carry 21 to 50 pounds at one time, and that she was capable of carrying 11 to 20 pounds for three to six hours per day. He further indicated that she was not required to alternate between sitting and standing. (T. 194–195). On June 5, 1996, in a residual functional capacity assessment directed to Padgett's counsel, he offered the opinion that since May 1, 1996, she has been totally disabled, noting that she has deteriorated since his last report. (T. 200). However, by letter dated June 24, 1996, Dr. O'Connor advised plaintiff's counsel that Padgett "has been disabled and able to do no more than light work since July of 1992." (T. 199).

In January and February of 1995, Padgett saw Dr. Syed Ehtisham twice for a fractured ankle.

On August 14, 1995, Padgett was examined by Dr. John R. Lamb, a consulting physician for SSA. (T. 141). He concluded that she has no evidence of hallucinations or delusions, is alert and oriented, has full range of motion of her joints, and has a normal gait. He further observed that her hypertension is well controlled. (T. 142, 143). On September 14, 1995, Dr. Mathew Alukal, a consultant for SSA, conducted an examination of Padgett and concluded that she could lift up to 50 pounds occasionally, up to 25 pounds frequently; that she could walk about six hours in an eight-hour work day; that she could sit about six hours in an eight-hour work day; and that her "push and/or pull" was unlimited. (T. 98–105).

In a report dated September 25, 1996, Dr. Jeffery Ribner, another consultant for SSA, examined Padgett and concluded that her abilities to sit and to stand were not affected by any of her impairments, that she was capable of climbing, balancing, stooping, crouching, kneeling and crawling frequently; that her ability to reach, handle, feel, push/pull, see, hear, speak were not affected by any impairment; and that her only environmental restrictions related to moving machinery and heights. (T. 205–210).

### C. *Padgett's Testimony*

At the hearing before the ALJ, Padgett testified that her ankle, which she fractured, "gives me trouble once in a while, but I just live. with it." (T. 44). She also indicated that she had weakness in her hands and that the most that she could

---

**2.** The date of March 13, 1996 is obviously a typographical error, and as reflected in the "Evaluation of Residual Functional Capacity" completed by Dr. O'Connor should be March 13, 1992.

pick up was about ten pounds. (T. 44). She indicated that she suffered from fatigue and that about two or three times a week, during the early afternoon, she would fall asleep in a chair and remain sleeping for about half the day. (T. 45). She also testified that she suffered from numbness in her mouth and in her left hand, and that with respect to her hand, the numbness occurred about once every two weeks and lasted for about five seconds. (T. 46). She further told the ALJ that she had a problem with shakiness, and as a result, frequently spilled things. (T. 46, 47). In addition, she testified that she could only stand for about a half hour without getting shaky, that she could walk about a quarter of a mile without her legs getting tired, and that she could only sit for about an hour at a time. (T. 48). She also indicated that she had a fear of falling and that she frequently would stumble or trip and have to catch herself. (T. 47).

## DISCUSSION

### A. *The Standard of Review*

 In reviewing the ALJ's decision, a court must decide whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or whether they are based on an erroneous legal standard. *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Where substantial evidence supports that Commissioner's conclusions, this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon a *de novo* review. Where evidence is susceptible of more than one rational interpretation, it is the Commissioner's conclusion which must be upheld.

*Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

### B. *Statutory and Regulatory standard for Widows' Insurance Benefits and SSI Benefits*

 In order to be found disabled under the Act, a claimant must be unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. See, 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1527. The Second Circuit has summarized the Commissioner's five-step sequential evaluation process for evaluating disability claims as follows:

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant would perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner must

prove the final one. *DeChirico v. Calla-han*, 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982)); see also 20 C.F.R. § 404.1520.

In addition, in order to qualify for benefits as a disabled widow, plaintiff must establish that she was at least fifty, but less than sixty years of age; that she was the widow of a wage earner who died fully insured; that she was not married; and that she was disabled within the meaning of the Act. 42 U.S.C. § 402(e). Additionally, the disability must have commenced not more than seven years after the insured wage-earner died or seven years after the widow was last entitled to mothers' or widows' benefits based on disability, whichever is later. 20 C.F.R. § 404.335(c). Plaintiff's husband died on February 2, 1990, and therefore plaintiff must prove that the disability began before February 2, 1997.

## C. *The ALJ's Decision*

■ The ALJ determined that Padgett was fully insured for purposes of widow's benefits through February 1997, had not engaged in substantial gainful activity since 1992, and based on the medical evidence in the record, suffers from a seizure disorder. However, the ALJ, proceeding to step 5 in the required sequential analyses, denied her both widow's and SSI benefits, determining that "considering the claimant's residual functional capacity for medium work, Rule 203.06 of the Medical Vocational Guidelines directs that the claimant is not disabled." The Commissioner argues that this decision by the ALJ is supported by substantial evidence and should be affirmed. The Court disagrees.

The ALJ rejected the opinion of Dr. O'Connor, Padgett's treating physician, that she was capable of performing only light work in the following fashion. "However, the totality of the medical evidence, including the data from the consulting neurologist and the State agency physician's necessarily lead to the conclusion that the claimant is capable of medium work." This conclusory rejection of Dr. O'Connor on the part of the ALJ is not consistent with the requirements of 20 C.F.R. § 404.1527(d)(2) and 20 C.F.R. § 416.927(d)(2) which direct "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

■ Furthermore, the ALJ did not comply with 20 C.F.R. § 402.35(b)(1) which states, "We published Social Security Rulings in the Federal Register under the authority of the Commissioner of Social Security. They are binding on all components of the Social Security Administration. These rulings represent precedent final options orders and statements of policy and interpretations that we have adopted." Specifically, the ALJ did not follow the requirements of Social Security Rulings 96–7P, and 96–9P.

In his decision, the ALJ made the following finding with respect to Padgett's credibility: "The claimant's allegations regarding totally disabling effects of her impairments are not credible. However, Social Security Ruling ("SSR") 96–7P requires that

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."

The ruling goes on to state

> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are

(or are not) credible'. It is also not enough for the adjudicator simply to cite the factors that are described in the regulation for evaluating symptoms. The determination or decision must contain specific reasons for the finding and credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

As measured against SSR 96–7P, the ALJ's determination as to Padgett's lack of credibility is insufficient.

■ The ALJ also stated in his decision, "Considering the claimants residual functional capacity for medium work, Rule 203.06 of the Medical Vocational Guidelines **directs** that the claimant is not disabled." The Court finds that this statement is incorrect. Social Security Ruling ("SSR") 96–9P indicates that

at the last step of the sequential evaluation process, the RFC assessment is to be used to determine an individual's 'maximum sustained work capability' and, where solely. non-exertional impairments are not involved, must be expressed in terms of the exertional classifications of work; sedentary, light, medium, heavy, and very heavy work. The rules of Appendix 2 of sub-part b of Regulations # 4 take administrative notice of the existence of numerous unskilled occupations within each of these exertional levels. The rules are then used to direct decisions about whether an individual is disabled or, when the individual is unable to perform the full range of work contemplated by an exertional level(s), as a framework for decision making considering the individual's RFC, age, education, and work experience.

The ruling goes on to explain that exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining ability to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. An exertional limitation is an impairment-cause limitation of any one of these activities. On the other hand, non-exertional capacity considers any work related limitations and restrictions that are not exertional. A non-exertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions, relating to such things as exposure to humidity, dust and the like, are also considered to be non-exertional. The ruling further states that it is the nature of an individual's limitations and restrictions, not certain impairments or symptoms, that determines whether the individual will be found to have only exertional limitations or restrictions, only non-exertional limitations or restrictions, or a combination of exertional and non-exertional limitations or restrictions. Based on the record, Padgett clearly has non-exertional limitations. It was, therefore, incumbent upon the ALJ, pursuant to SSR 96–9P to make a determination that such non-exertional limitations did not significantly erode Padgett's occupational base, before concluding that Rule 203.06 of the Medical Vocational Guidelines directed a finding of "not disabled." The ALJ failed to do so.

### CONCLUSION

In reviewing disability claims, a District Court may affirm, modify, or reverse the determination of the Commissioner with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Court finds that the ALJ's determination that the plaintiff possessed the residual functional capacity for medium work, and therefore, was not disabled pursuant to Rule 203.06 of the Medical Vocational Guidelines is inconsistent with the record. Consequently, it cannot be said that the Commissioner's

denial of widow's insurance benefits and Supplemental Social Security Income is supported by substantial evidence. The Court hereby orders that the case be remanded to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g) for proceedings consistent with this Decision.

IT IS SO ORDERED.